[No. 7,787.—In Bank.]
May 26, 1882.

## P. REDDY *v.* Z. B. TINKUM.

TERRITORIAL JURISDICTION OF THE STATE—COUNTY GOVERNMENTS—MONO COUNTY WARRANTS.—By an Act of the Legislature passed in 1861 for the creation of the County of Mono, the eastern boundary of the State was made the eastern boundary of the County and it was provided, that the seat of justice should be at Aurora; but upon the definite location of the State boundary line under legislative authority it was ascertained

that Aurora was within the then Territory of Nevada, and thereupon, (in year 1864) an Act was passed establishing the County seat at Bridgeport, a point west of the State line.  By the former Act an election of County officers was provided for, and seven persons were named, (all of them residents of Nevada Territory), to constitute a Board of Commissioners to designate the election precincts in the County, canvass the returns and issue certificates of the election and officers were accordingly elected and qualified and assumed to perform official functions.  In an application for a writ of mandamus to the Treasurer of the County of Mono to compel him to pay certain warrants drawn by the Auditor thus elected in the years 1862 and 1863, endorsed "presented and not paid for want of funds" by the person then assuming to act as County Treasurer, the Court below denied the writ.

*Held :* The writ was properly denied.  Neither the warrants nor the claims upon which they are based form any basis for a legal demand against the County as now organized.  The action of the Legislature in naming Aurora as the seat of justice, and in naming persons as officers who are non-residents of the State whether regarded as a mistake, or as an intended assertion of jurisdiction, was in excess of its authority.

ID.—ID.—The legislative authority of every State must spend its force within the territorial limits of the State; it has no extra-territorial jurisdiction.

APPEAL from a judgment for the defendant and from an order denying a new trial in the Superior Court of Mono County.  WIGGIN, J.

*P. Reddy, in propria persona,* for Appellant.

The evidence was insufficient to justify the second finding of the Court, to the effect that R. M. Wilson was not the legally elected or qualified County Auditor of Mono County, and that William Feast was not the legally elected or qualified Treasurer.  The testimony of Z. B. Tinkum and that of J. G. McClinton show that they were officers *de facto* and *de jure.* (C. C. P. § 1963, sub. 14; *Cohas* v. *Raisin,* 3 Cal. 453; *The People* v. *David Clingan,* 5 id. 389; *The People* v. *Roberts,* 6 id. 214; *Mott* v. *Smith,* 16 id. 535.)

The judicial department cannot interfere with or revise the acts of the political power of the State. (*Nougues* v. *Douglass,* 7 Cal. 65; *Napa Valley R. R. Co.* v. *Napa Co.,* 30 id. 435.) From the time of the organization of the State up to the fourth of April, 1864, the State of California had claimed up to a line a considerable distance to the eastward of the town of Aurora, and had claimed, and actually exercised, jurisdiction up to that line.  It will be observed that the Acts of

1863 and 1864 respecting the eastern boundary line are not retroactive. The purpose of that Act was to settle disputes about the boundary line, and jurisdiction in the future. (*Poole* v. *Fleeger*, 11 Peters, 209.)

The Courts of a State are bound by the claim and exercise of jurisdiction *de facto* of their own government, because the question of State boundaries is purely a political one, so far as State Courts are concerned. (Best on Ev., vol. 1, § 253; Greenl. on Ev. 11th ed. vol. 1, § 6; *Bedell* v. *Loomis*, 11 N. H. 9; *State* v. *Dunwell*, 3 R. I. 127; *Vanderwerker* v. *The People*, 5 Wend. 530; *People* v. *Smith*, 1 Cal. 9; *Foster* v. *Neilson*, 2 Pet. 253; *Williams* v. *Suffolk Ins. Co.*, 3 Sumn. 270; *United States* v. *Arredondo*, 6 Pet. 710; *Poole* v. *Fleeger*, 11 id. 185; *Massachusetts* v. *Rhode Island*, 11 id. 657; *Garcia* v. *Lee*, 12 id. 511; *Williams* v. *Suffolk Ins. Co.*, 13 id. 419, 420; *Luther* v. *Borden*, 7 How. 1.)

In case of a dispute with an adjoining State, the Legislature is to act for the State in adjusting such dispute.

The contending States may, with the consent of Congress, establish by agreement a boundary, although not the true line; or the question may be referred to the Supreme Court of the United States, which is the only Court authorized to take cognizance of such a question, and to judicially determine the same. (*Rhode Island* v. *Massachusetts*, 12 Peters, 657.)

The 9th Section of the Act of 1863 provided that notice should be given to the Governor of the Territory of Nevada, and that he be requested to appoint a person or persons to act in conjunction with the Surveyor General of this State in the establishment of said lines, so that the line established by that survey was by agreement and by the joint action of the two governments.

They had the right to establish a boundary line by agreement, no matter whether it was the true line or not.

The consent of Congress had already been obtained, as will be seen by reference to the Organic Act of the Territory of Nevada. (12 United States Statutes at Large, 209.)

It does not follow that the line established under the Acts of 1863 and 1864 is the line mentioned in our Constitution, but nevertheless it has been binding and conclusive upon the

Courts, all corporations, and citizens of this State, as the legal boundary from the time it was established. (*Poole* v. *Fleeger*, 11 Peters, 209.)

The boundaries of Rhode Island were designated in the Charter of 1663. Notwithstanding the fact that the lines were so designated in the Charter, the Rhode Island Court held that it was bound by the claim *de facto* of jurisdiction by the political department of the State. (*State* v. *Dunwell*, 3 R. I. 127; *Bedell* v. *Loomis*, 11 N. H. 9; *Rhode Island* v. *Massachusetts*, 4 How. 591.)

While such a question is pending, there must be some power in the State, and that must be the political power, to assert the rights of the State to its territory, and to contend for the establishment of the boundaries upon what the political power deems to be the true and proper line. Otherwise, before the marking of the boundaries the State might be invaded upon all sides by its neighbors.

The claim of the State, prior to the Act of 1864, followed by actual exercise of jurisdiction, was not unconstitutional, and was made in conformity with the power conferred upon the legislature by the Constitution of the State.

And its claim to jurisdiction over the territory upon which the town of Aurora is situated, was just as valid, and was as binding upon the Courts of the State, as is its claim of jurisdiction over the territory now within the line established in 1864.

The Acts of 1863 and 1864 operated simply as a change of boundary. Whether that change was made in consequence of a cession of territory to Nevada, or with a view to compromise the dispute existing between the two governments, makes no difference whatever.

It is plain that the Courts of the county, which were held at Aurora during the years 1861, 1862, and 1863, would have exceeded their powers, had they determined that the town of Aurora was not in the State of California; and that it would have been an act of suicide to make such a decision. Is it not equally suicidal for the Court of Mono County, at the present day, to make such a decree ? What is there in the Acts of 1863 and 1864 to warrant the Court in such a deter-

mination? Those Acts did not pretend to affect the past claims of the State.

It cannot be pretended that California intended to declare, by those Acts, that its former claim was false or unfounded, or that it had invaded the Territory of Nevada. The State or county government cannot cast the burden of its own mistakes as to boundaries upon the citizen.

The citizen can only learn the boundaries of the State by reference to the Acts of the legislature. Mono County was created under the Act of 1861. All of its powers and liabilities are regulated by legislative enactment. It is the creature of the statute; it cannot deny its own existence where the statute affirms it.

It can not disincorporate or dissolve itself. It can not deny possession of a power conferred. It can not alter or fix its own boundaries, nor can it enter into a dispute with its creator, respecting the boundaries of the State. It is not possessed of sovereign power, and can not engage in disputes between sovereign States. When the legislature designated the county seat, the county had no power to say that that was not the county seat of the county. It can not fix the date of its creation so as to suit itself, and to cheat its creditors. It can not claim an existence, as it did, for the purpose of collecting revenue, accepting services and value from individuals, and then deny its existence, at that time, for the purpose of evading its debts.

The governmental powers which it exercised were conferred upon it by the State; and it can not be permitted to claim and exercise such functions, and yet deny the power of the State to grant them.

If the State of California, by mistake, was possessed of, and exercised jurisdiction over, the territory east of the State line as described in the Constitution of the State, it was a government *de facto* over said territory, and the County of Mono was one of the agencies adopted by the State for governing that section of country. The State would not repudiate any of its contracts made for carrying on such government; and the county can not. (*Dinwiddie County* v. *Stuart, Buchanan & Co.*, 28 Grat. 536; *Texas* v. *White*, 7 Wall. 702.)

*T. W. W. Davies*, for Respondent.

As matter of affirmative defense, we submit, that by the evidence there was no legal organization of the County of Mono during the years 1862 and 1863, when these warrants were drawn, nor until late in the year 1864, after the county seat was established at Bridgeport, and the county officers elected at the special election in June, 1864, qualified and entered upon the discharge of their duties. And, as there was no legally organized county government, as a consequence, there was no power to bind the county vested in the pretended officials. During the years 1861, 1862 and 1863 there was no county seat of Mono County.

California was limited by the eastern boundary line as so fixed and defined, and the territory east of that line was the property and under the exclusive jurisdiction of the Government of the United States of America.

So much of the Act organizing Mono County, 1861, as regards making Aurora the county seat was void, being in excess of the powers of the Legislature. (Cooley on Con. Lim. 127, 128.)

In Story on Conflict of Laws, Sec. 7, Judge Story says : " It is plain that the laws of one country can have no intrinsic force, *proprio vigore*, except within the territorial limits and jurisdiction of that country. They can bind only its own subjects, and others who are within its jurisdictional limits; and the latter only while they remain therein. No other nation, or its subjects, are bound to yield the slightest obedience to those laws." And in the same section he quotes from Boullenois (1 Boullenois, Principes Generaux, 6, p. 4,): " Of strict right, all the laws made by a sovereign have no force or authority, except within the limits of his dominions." (Story on Conflict of Laws, Secs. 7, 8, 19, 20, 22, and 539, fifth edition; *Blanchard* v. *Russell*, 13 Mass. 4; S. C., 7 Am. Dec. 106; *United States* v. *Bevans*, 3 Wheat. 386 ; *Miller* v. *Ewer*, 27 Maine, 517 ; 6 Johns. Ch. 357; 2 Kent's Com. 3d. ed. 457; *Collins* v. *State*, 30 Amer. Rep. 142; Henry on Foreign Law, 1; *People* v. *New Jersey Central R. R. Co.* 42 New York, 283 ; *United States* v. *Owens*, 2 Peters, 540; *Bank* v. *Donnally*, 8 id. 372; *Rhode Island* v. *Mass.*, 12 id. 736; *Bank of Augusta* v. *Earle*, 13 id. 588.

There were no legally elected and qualified county officers in Mono County during the years 1861, 1862, and 1863.

Each member of this commission was a non-resident alien, residing in the Territory of Nevada, and all of their official acts as to said election were done without the State of California, and at Aurora, Nevada Territory.

The R. M. Wilson, who assumed to act as Auditor in the issuing of the alleged warrants, and the William Feast, who assumed to act as Treasurer in indorsing said warrants, were non-resident aliens, not qualified electors of the State of California, and ineligible to office in this State.

And the same is true of two members of the pretended Board of Supervisors, Schultz and Green, being a majority of said Board. (Cons. Art. ii, § i; *Searcy* v. *Grow*, 15 Cal. 121; Wood's Dig., 693, Art. 3314, 3315; *Bourland* v. *Hildreth*, 26 Cal. 161.)

In view of the foregoing, it is submitted that during the years 1862 and 1863, when these alleged warrants were issued, there was no Mono County, and consequently no power to bind the county. (*Clark* v. *Robinson*, 88 Ill. 511; *People* v. *Morrell*, 21 Wend. 563; *State* v. *Walker*, 17 Ohio, 135; *Buckinghouse* v. *Gregg*, 19 Ind. 401; *People* v. *McGuire*, 32 Cal. 143; *People ex rel. Tracy* v. *Brite*, 55 id. 79.)

MYRICK, J.:

This is a proceeding for a writ of mandate directing the respondent, County Treasurer of Mono County, to pay to petitioner the amounts of certain warrants set forth in the petition. The warrants bear date respectively various days from February 8, 1862, to December 14, 1863, and are signed "R. M. Wilson, County Auditor," and indorsed, "Presented and not paid for want of funds. Wm. Feast, County Treasurer." The Court below found that said Wilson was not County Auditor of Mono County; that said Feast was not County Treasurer; that the alleged warrants were not drawn by any officer authorized to draw the same, nor presented to any officer authorized to register the same; that the claims for which the warrants were drawn were never examined, settled, allowed, and ordered paid by the Board of Supervisors of Mono County; that the acts of said Wilson, purporting and

pretending to be County Auditor, and of said Feast, purporting and pretending to be County Treasurer, relative to said warrants were done and performed at Aurora, in the County of Esmeralda, in the then Territory, now State of Nevada; that the acts of the persons purporting and pretending to compose the Board of Supervisors, relative to the examination and allowance of the claims on which the warrants were drawn, were done and performed at said Aurora; that said Wilson and Feast, and a majority of the pretended Board of Supervisors, were non-residents of the State of California and were residents of said Territory of Nevada: and thereupon the Court rendered judgment for respondent, Tinkum. The petitioner appealed from such judgment and from the order denying his motion for a new trial.

In 1861 the Legislature of this State passed an Act for the creation and organization of the County of Mono. (Stats. 1861, 235.) In the Act the boundaries are defined, and the eastern line of the State is made the eastern line of the proposed county. The second section reads: "The seat of justice of Mono County shall be at Aurora." An election of county officers was provided for, and seven persons were named to constitute a Board of Commissioners, to designate the election precincts in the county, canvass the returns and issue certificates of election. The meetings of the Board were to be held at Aurora. We may presume that the Legislature, in passing this Act, supposed that Aurora was within the State of California and within the boundaries of the proposed county; such, however, was not the fact. In 1863 the eastern boundary line of the State was definitely run and established, under legislative authority, and it was then ascertained that Aurora was within the then Territory of Nevada. At the first session of the Legislature thereafter, to wit, in 1864, an Act was passed establishing the county seat at Bridgeport, a point west of the State line. From and after the passage of the Act of 1861, and during the years 1861 1862, and 1863, a form of county government was entered upon and kept up; elections were held, and persons assumed to perform official functions. The persons named in the Act of 1861 as a Board of Election Commissioners resided in said

Territory of Nevada, as did many of the persons performing functions as county officers, and all the business of the county was transacted at Aurora. The foundation of the warrants in suit was the business thus transacted, viz., seventeen of the warrants were for salary and expenses of said Wilson as Auditor, sixteen were for jury fees, and others were for compensation as Supervisor, District Attorney and the like. At the time of these transactions, Territorial Courts were being held at Aurora, and Territorial elections were had. Aurora was the established county seat of Esmeralda County, Nevada. It appears that at some elections electors were voting at Aurora for Territorial officers, and at others for officers for Mono County. It may be added that at the elections held for Mono County a majority of the votes cast were cast at Aurora. How the comparison existed as to Esmeralda County we are not informed.

We think that the action of the Court below was proper, as well in regard to the findings of fact, as to the conclusions of law and judgment. We think that neither the warrants nor the claims upon which they are based, form any basis for a legal demand against the county as now organized.

First—It is claimed by petitioner that from the organization of the State until April 4, 1864, the State had claimed to a line a considerable distance east of Aurora, and had actually exercised jurisdiction to that line; and that the Courts of a State are bound by the claim and exercise of jurisdiction *de facto* of their own government, because the question of State boundary is purely a political one, so far as State Courts are concerned. Even granting, which we do not, the correctness of that position, to the extent claimed, we are not advised by the Act of 1861, that the State claimed jurisdiction to any point or line east of the boundary line; the Act expressly bounded the new county by the eastern boundary line of the State, without other naming of any tangible object or point; it manifested no intent to go beyond the line of the State; the most that can be said, in that regard, is, that the Legislature erroneously supposed that Aurora was within the State. The Act said: "The seat of justice of Mono County shall be at Aurora," and that is the only reference to any point beyond the line of the State. As soon

as the error was ascertained, the State at once took appropriate action, and established a county seat within the State and county. The naming of Aurora as the seat of justice was clearly a mistake; and we are not prepared to say that a mistake can be raised to the dignity of a political assertion.

Second—Even if there had been no mistake, the action of the Legislature in naming Aurora as the seat of justice, and in naming persons as officers who were non-residents of the State, was in excess of its authority. As well might the Legislature, in creating the county, say of Sacramento, and defining its boundaries, have said, the seat of justice shall be at Deming or Omaha; and as well might it have enacted that citizens of Tennessee or Ohio should district the county into election precincts, canvass the returns of elections and certify the results.

"The legislative authority of every state must spend its force within the territorial limits of the State." It has no extra-territorial jurisdiction. (Cooley on Const. Lim., 127-8; Story on Const. Law, Secs. 7, 8, 20.)

It is true that the creation of counties and establishing their boundaries, is the exercise of a political function, but the exercise of that function must be within the scope of the power exercising it.

Judgment affirmed.

MORRISON, C. J., concurred.

THORNTON and McKINSTRY, JJ., concurred in the judgment.